## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ROBERT NAMER                                    CIVIL ACTION

VERSUS                                          NO. 12-2232

BROADCASTING BOARD                              SECTION "B"(5)
OF GOVERNORS, ET AL.

### ORDER AND REASONS

Before the Court is Defendants', Broadcasting Board of Governors ("BBG") and Voice of America ("VOA") (collectively, "Defendants"), Motion for Summary Judgment (Rec. Doc. 66), as well as the responsive pleadings thereto filed by both parties (Rec. Docs. 75, 78). Defendants move the Court pursuant to Fed. R. Civ. P. 56 for summary judgment on the following issues:

(1) That Plaintiff/Counter-Claim-Defendant, Robert Namer ("Plaintiff") has infringed the government's service mark VOICE OF AMERICA, pursuant to 15 U.S.C. §1114;

(2) That Plaintiff cannot establish the equitable defense of laches;

(3) That Plaintiff cannot establish the affirmative defense of invalidity for genericness; and

(4) Defendants are entitled to injunctive relief pursuant to 15 U.S.C. §1116.

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED,** as set forth fully below.

### Facts and Cause of Action:

This case arises out of the disputed use of the phrase "Voice of America" as the name of Plaintiff's business and the use of the domain name "www.thevoiceofamerica.com" and the phrase "Voice of America" in connection with Plaintiff's websites and publication activities.[1] Defendants herein are the Broadcasting Board of Governors ("BBG") and Voice of America ("VOA"). The record reflects that Plaintiff began operating as the "Voice of America" in the context of seminars, lectures, print, radio, and television in the United States and in the State of Louisiana as early as 1968. (Rec. Doc. 1 at 3). Plaintiff further registered Voice of America, Inc. as a Louisiana corporation in 1977 (Rec. Doc. 1 at 3). In 1991, Plaintiff began airing a radio program under the name "Voice of America" on various radio stations. (Rec. Doc. 1 at 3). Of particular issue here, Plaintiff purchased the domain name "www.thevoiceofamerica.com" in 1998 and, sometime thereafter, used the website hosted at that domain to broadcast his radio programs over the internet. (Rec. Doc. 1 at 3).

On February 7, 2000, Defendant BBG corresponded with Plaintiff asserting that it had the exclusive legal right to use the name "Voice of America" and demanded Plaintiff cease using the name. (Rec. Doc. 1-5). Plaintiff contends he responded to

---

[1] For a detailed statement of the underlying facts, see the Court's Order and Reasons granting various portions of Defendants' Motion to Dismiss (Rec. Doc. 33).

this correspondence asserting his prior use of the name and noting his purchase of the contested domain name in 1998. (See Rec. Doc. 75-7 at ¶ 9-10).[2] BBG does not appear to have taken any further action at that juncture.

On July 22, 2005, BBG applied for its word mark, number 3205170 for "Voice of America." (Rec. Doc. 1-6). Thereafter, the word mark was published for opposition on November 21, 2006 and was registered on February 6, 2007 with the U.S. Patent and Trademark office. Id. In April 2011, Namer received a letter from the BBG alleging, among other things, that it had used the phrase "Voice of America" since before World War II. (Rec. Doc. 66-16). The letter indicated a concern that Namer's website audiences could be confused by the similarities between Mr. Namer's use of the domain "www.thevoiceofamerica.com" and BBG's alleged "Voice of America" service mark.

On November 9, 2011, the BBG submitted a Complaint to the National Arbitration Forum pursuant to the Uniform Domain Name Dispute Resolution Policy ("URDP") seeking transfer of the domain name "thevoiceofamerica.com" to the BBG. (Rec. Doc. 11-1, at 2). In a final decision dated December 21, 2011, the Forum

---

[2] It should be noted that although a copy of the BBG's correspondence to Plaintiff is included in the record (See Rec. Doc. 1-5), the only evidence that Plaintiff brought the 1998 domain name registration to the attention of BBG in response thereto is in the form of a declaration by Plaintiff attached to his opposition to Defendants' motion for summary judgment. (Rec. Doc. 75-7 at ¶9-10).

panel ordered such transfer. (Rec. Doc. 11-1, at 2; Rec. Doc. 1, Ex. G). The arbitrator opined that the domain name, "www.thevoiceofamerica.com", was identical or confusingly similar to the word mark of BBG; that Namer had no legitimate interest in the domain name; and that Namer registered and used the disputed domain name in bad faith. (Rec. Doc. 1, at 8).

On January 4, 2012, Plaintiff Robert Namer filed a civil action to prevent transfer of the domain name registration "thevoiceofamerica.com" to Defendant BBG, but that case was dismissed on July 12, 2012, for plaintiff's failure to effect proper service of process. (Rec. Doc. 11-1, at 2; *see Namer v. Broadcasting Bd. of Governors*, Civ. No. 12-14, 2010 WL 3597081 at *1 (E.D.La. August 20, 2012)).

On September 7, 2012, plaintiff commenced this lawsuit by filing a "COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF." (Rec. Doc. 1). As to a remedy, the Complaint requested, *inter alia*, that the Court grant plaintiff's Complaint for Declaratory Judgment and declare that Namer has the legal right to continue doing business under the name "Voice of America." (Rec. Doc. 1, at 17).

Thereafter, Defendants moved for dismissal of Counts I, II, and V of Plaintiff's Complaint,[3] which this Court granted. (See Rec. Doc. 33). Defendants then filed an Answer (Rec. Doc. 34) to Plaintiff's Complaint with respect to the remaining counts (III and IV)[4] and further brought a Counterclaim alleging Plaintiff's infringement of their trademark under 15 U.S.C. §1114 and requesting the issuance of injunctive relief to prevent further infringement. (See Rec. Doc. 34 at 9-13). Defendants have since brought the instant motion seeking summary judgment on their counterclaims against Plaintiff. (Rec. Doc. 66).

Defendants' motion for summary judgment raises the following four issues:

(1)  Whether a genuine issue of material fact remains as to Plaintiff's alleged infringement of Defendant's mark pursuant to 15 U.S.C. §1114;

(2)  Whether a genuine issue of material fact remains as to Plaintiff's inability to prove the elements of the affirmative defense of laches;

---

[3]  These counts consisted as follows: Count I – Plaintiff's "Prior Use Defense"; Count II – Plaintiff's "Fair Use Defense"; Count V – Plaintiff's Claim for "Interference with Business Relations." (Rec. Doc. 1 at 8-16).

[4]  The remaining counts consisted of: Count III – Plaintiff's "Generic Defense" and Count IV – Plaintiff's "Doctrine of Laches" Defense. (Rec. Doc. 1 at 12-14).

(3)  Whether a genuine issue of material fact remains to Plaintiff's inability to prove the affirmative defense of invalidity for genericness; and

(4)  Whether Defendants are entitled to injunctive relief.

## Contentions of Parties:

### (1)  *Federal Trademark Infringement under 15 U.S.C. §1114*

On this issue, Defendants contend they have affirmatively established the elements for a prima facie case of federal trademark infringement; namely (1) that they own a validly registered trademark, (2) that Plaintiff is responsible for an unauthorized use of that mark, and (3) that Plaintiff's use is likely to cause confusion among consumers in the marketplace. (Rec. Doc. 66-2 at 11)(citing 15 U.S.C. §§ 1114(a), 1115). With respect to this last element, Defendants contend the eight "digits of confusion" considered by courts in determining the likelihood of confusion compel in favor of a finding of Plaintiff's infringement, relying primarily on statements of Plaintiff to the effect that he was aware of the government's VOA broadcast at the time of his early operations and also upon the results of a survey purportedly showing actual confusion among a significant number of potential users of Plaintiff's services. (See. Rec. Doc. 66-2 at 13-16). Accordingly,

Defendants argue they are entitled to summary judgment on the issue of Plaintiff's infringement of their trademark.

Plaintiff counters by arguing, first, that Defendants have failed to prove Plaintiff's failure to establish the defense of laches (discussed in detail below) and that this in itself is sufficient to preclude summary judgment on this issue. (Rec. Doc. 75 at 7). Alternatively, Plaintiff argues Defendants have failed to establish infringement because there has not been a sufficient showing of "likelihood of confusion." *Id*. To this end, Plaintiff attacks the relevance of the survey commissioned by Defendants on the ground that the survey universe did not properly screen for "reasonably prudent consumers," which, according to Plaintiff, are the consumers made relevant under applicable legal standards. (Rec. Doc. 75 at 8-9). *See Brookfield Commcn's, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1060 (5th Cir. 1999).

### *(2)* Plaintiff's Defense of Laches

Defendants argue Plaintiff has failed to carry his burden of proving the elements of the affirmative defense of laches, which are: (1) a delay on the part of Defendants in asserting their trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to Plaintiff caused by the delay. (Rec. Doc. 66-2 at 11)(citing *Bd. of Supervisors for Louisiana State Univ.*

*Agric. And Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 489-90 (5th Cir. 2008)). In particular, Defendants argue Plaintiff mischaracterizes the relevant timeframe for computing delay, given that BBG's letter of February 2000 only referred to radio programming as opposed to internet activities for purposes of determining when Defendants were on notice of Plaintiff's alleged infringement. (Rec. Doc. 66-2 at 20). BBG argues it first learned of Plaintiff's internet activities in April 2011 and contacted him regarding such activity that same year. (Rec. Doc. 66-2 at 20-21). In any event, Defendants argue the earliest Plaintiff may contend Defendants should have been aware of his internet activities is 2004 when content first appeared on the site. (Rec. Doc. 78 at 5).

Defendants also assert that even if Plaintiff can establish the elements of delay and undue prejudice, the doctrine of progressive encroachment precludes Plaintiff's laches defense. (Rec. Doc. 66-2 at 22)(citing J. Thomas McCarthy, 2 McCarthy on Trademarks, §31:20)(4th ed. 2014). According to Defendants, this is because any tacit approval of Plaintiff's early radio activities would be vitiated by the scope of his later widespread infringement over the internet. (Rec. Doc. 66-2 at 21-22).

Defendants further argue Plaintiff has failed to establish the element of undue prejudice because Plaintiff has presented no evidence demonstrating financial or economic detriment resulting from Defendants' alleged delay. (Rec. Doc. 66-2 at 8-9). Additionally, Defendants argue Plaintiff is barred from asserting prejudicial reliance in light of his admission that he received BBG's initial letter of 2000, which put him on notice of Defendants' objections to his use of the contested mark "in connection with [his] programming." (Rec. Doc. 78 at 9). Finally, Defendants argue the defense of laches does not ordinarily operate to bar the issuance of prospective injunctive relief when there is strong evidence of likely or actual confusion. (Rec. Doc 78 at 6).

Plaintiff responds that Defendants had actual knowledge of the existence of his website starting in early 2000 because Plaintiff responded to BBG's letter of that year informing it that he had registered the domain name "www.thevoiceofamerica.com" in 1998. (Rec. Doc. 75 at 6). In support of this contention, Plaintiff cites a Declaration attached to his Opposition (Rec. Doc. 75-7) to Defendants' Motion stating as much. Plaintiff does not, however, attach a copy of any such letter. Plaintiff relies on BBG's alleged notice in 2000 of the domain name registration to argue both in

favor of undue delay and to defeat Defendants' progressive encroachment argument. (Rec. Doc. 75 at 6). According to Plaintiff, the competing assertions as to when BBG was first on notice of Plaintiff's registration of the domain name, at the very least, preclude entry of summary judgment on the laches defense.

### (3)   *Plaintiff's Defense of Invalidity of Genericness*

Plaintiff initially argued in his Complaint that Defendants could not validly challenge his use of the mark, asserting the defense of genericness. (Rec. Doc. 1 at 12)(citing 15 U.S.C.§ 1064(3), *Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270, 1274 (S.D.N.Y. 1983)). Plaintiff contended that the terms "Voice" and "America" were both generic components which combined to create a generic compound; one that is not properly protected under federal trademark law. (Rec. Doc. 1 at 14).

Defendants argue federal registration constitutes a strong presumption of validity of the registered mark and that the registered term is not generic. (Rec. Doc. 66-2 at 22)(citing J. Thomas McCarthy, 2 McCarthy on Trademarks, §12:2)(4th ed. 2014)). Further, Defendants argue, Plaintiff, as challenger, bears the burden of overcoming such presumption. *Id.* Defendants note that Plaintiff has submitted no affirmative evidence concerning

10

public understanding of the term "Voice of America" and that the deadline for doing so has passed. (Rec. Doc. 66-2 at 23)(citing J. Thomas McCarthy, 2 McCarthy on Trademarks, §12:12, "Consumer surveys have become almost de rigeur in litigation over genericness.") Additionally, as Defendants note, Plaintiff has failed to make any arguments to the contrary in his Opposition to Defendants' Motion for Summary Judgment. (Rec. Doc. 78 at 4).

   *(4)  Defendants' Claim for Injunctive Relief*

   Finally, Defendants contend they have satisfied the elements for a showing of entitlement to injunctive relief; namely, (1) they have suffered irreparable injury, (2) there is no adequate remedy at law, (3) that, considering the balance of hardships between the parties, a remedy at law is warranted, and (4) that it is in the public's interest to issue the injunction. (Rec.Doc. 66-2 at 12)(citing *Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir. 2006); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

   In these respects, Defendants cite the Declaration of Steven Springer, a Senior Executive Producer with VOA, stating that the worldwide reputation and goodwill associated with VOA would be irreparably harmed if a visitor to Plaintiff's website confused VOA as the source of that content or affiliated with that content. (Rec. Doc. 66-2 at 24-25)(citing Rec. Doc. 66-17).

Further, U.S. foreign policy objectives would be frustrated if VOA's mission to other countries were hindered. *Id.* Defendants also argue that injunctive relief is a common remedy in trademark infringement matters. (Rec. Doc. 66-2 at 25). Finally, Defendants contend Plaintiff would suffer no hardship in the event the Court were to issue injunctive relief because Defendants have no objection to Plaintiff's continued use of his other domain name, "www.hottalkradio.com", so long as the content of that page is amended to remove references to the disputed mark. (Rec. Doc. 66-2 at 26).

Plaintiff's sole response on the issue of injunctive relief is that Defendants have not shown the risk of irreparable harm because they have failed to take comparable action against the "even more similar" domain name, "www.voiceofamerica.com", which apparently is owned by another private entity. (Rec. Doc. 75 at 11-12). On this point, Defendants respond that the foregoing URL does not appear to resolve a functioning site at present. (Rec. Doc. 78 at 13). Defendants further note that Plaintiff fails to address the fact that injunctions issue as a standard and routine remedy in trademark infringement and unfair competition cases. (Rec. Doc. 78 at 13)(citing J. Thomas McCarthy, 4 McCarthy on Trademarks, §30:2)("Injury is presumed because if confusion is likely, it is also probable that the senior user's

12

reputation is placed in the hands of another—the junior user. The law views the owner of a trademark as damaged by an infringing use 'which place[s] the owner's reputation beyond its control, though no loss in business is shown.'").

**Analysis:**

*Summary Judgment Standard*

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the nonmovant must produce specific facts to demonstrate that a genuine issue exists for trial.  *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir. 1998).  The moving party bears the initial responsibility of informing the district court of the basis for its motion.  *Celotex*, 477 U.S. at 323.  The movant must point to "portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56). If and when the movant carries this burden, the nonmovant must then go beyond the pleadings and use affidavits, depositions, interrogatory responses, admissions, or other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]here the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. . . . Only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616 (5th Cir. 1994) Accordingly, conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993).

  *(1) Federal Trademark Infringement*

  There is no dispute that Defendants have registered the mark "Voice of America" pursuant to applicable federal trademark laws. As such, Defendants' registration is "prima facie evidence

14

of the validity of the registered mark . . . and of the registrant's right to use the registered mark in commerce or in connection with the goods or services specified in the registration . . . ." 15 U.S.C. §1115(a). These uses include, pursuant to the registration statement, "production of radio or television programs [and] publication of electronic newspapers accessible via a global computer network. . . ." (Rec. Doc. 66-5 at 2). Plaintiff does not dispute that his activities are covered by the terms of this language and further does not contend his use is unauthorized by Defendants.[5] Accordingly, the only contested issue for purposes of the instant motion is whether Plaintiff's use creates a "likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship" of the product. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000). This, in turn, is determined by reference to the so-called "digits of confusion," including: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, as well as (8) the degree of care exercised by

---

[5] With the exception of any claims of tacit approval relating to his defense of laches, discussed in detail in the section relating thereto.

potential purchasers. *Bd. of Supervisors for Louisiana State Univ. Ag. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)(citing *Westchester Media*, 214 F.3d at 664). No single factor is dispositive and a "finding of a likelihood of confusion need not be supported by a majority of the factors." *Id.* "[L]ikelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Id.* (citing *Westchester Media*, 214 F.3d at 663-64).

The Court takes each digit in turn:

> *(1)Type of Mark*

With respect to this digit, courts look generally to the "strength of the mark." *Smack Apparel*, 550 F.3d at 478-79. This often involves reference to the length of use by the mark holder balanced against any possible "extensive" third-party use, which can weaken a mark, negating the likelihood of confusion. *Id.* On this digit, Defendants refer to BBG's use of "Voice of America" dating back to the World War II era and, as reflected by a U.S. Patent and Trademark Office Registration Statement, as early as 1942. (Rec. Doc. 66-2 at 14). Additionally, Defendants cite statements of President Eisenhower in 1957 that "[f]or fifteen years now the Voice of America has been bringing to people everywhere the facts about world events, and about America's

16

policy in relation to these events." (Rec. Doc. 66-7 at 1).
Plaintiff effectively presents no contrary evidence and the
Court concludes Defendants have established a strong mark for
purposes of the first digit. This, in turn, weighs in favor of
Defendants' position.

### (2)The Similarity between the Two Marks

As to this digit, there is no credible argument that "Voice
of America," Defendants' registered mark, and
"www.thevoiceofamerica.com," Plaintiff's domain name, are not
virtually identical. Accordingly, this digit weighs in favor of
a finding of likelihood of confusion created by Plaintiff's use.
*See, e.g., Brookfield Commc'ns, Inc. v. West Coast Entm't
Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999)(requiring comparison
between allegedly infringing mark and claimant's trademark and
concluding that "MovieBuff" and "moviebuff.com" were "for all
intents and purposes, identical in terms of sight, sound, and
meaning.").

### (3) Similarity of Products or Services

As to this third digit, "[t]he degree of similarity of the
marks needed to prove likely confusion will vary with the
difference in the goods and services of the parties. Where the
goods and services are directly competitive the degree of
similarity [in marks] to prove a likelihood of confusion is less

17

than in the case of dissimilar products." J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition, §23:20.50 (4th ed. 2014)(hereafter "McCarthy"). Conversely, "the greater the similarity in the marks, the lesser the similarity required in the goods or services of the parties to support a finding of likely confusion." *Id*. As noted above, the marks presently at issue are virtually identical. Accordingly, a relatively lesser degree of similarity in products or services will suffice in order for this digit to weigh in favor of a likelihood of confusion between the two.

In support of their position here, Defendants cite Declarations of Steven Springer, a Senior Executive Producer with VOA, and deposition testimony of Plaintiff himself. (See Rec. Doc. 66-2 at 15). Springer is quoted as stating: "the Voice of America (VOA) is a dynamic multimedia news organization funded by the U.S. Government that delivers accurate, balanced, and comprehensive news and information to an international audience via radio, television, the internet and mobile devices." (Rec. Doc. 66-2 at 15)(citing Rec. Doc. 66-17 at 2). Plaintiff, in turn, is quoted as characterizing "www.thevoiceofamerica.com" as a "'news information portal' including commentary, political news, and economic news." (Rec.

Doc. 66-2 at 15)(citing Rec. Doc. 66-9 at 23-24).[6] Indeed, the record clearly reflects that Plaintiff's website is aimed at providing news information and commentary with a particular focus on politics and economics. (See, e.g., Rec. Doc. 75-2 at 23-24). Plaintiff again, effectively fails to dispute this contention, preferring instead to place all of his proverbial eggs in the basket of challenging the relevance of the survey commissioned by Defendants on the issue of "actual confusion" (discussed fully below). In light of the high degree of similarity between the marks at issue, the relative similarity between their product and service offerings (they are both effectively news dissemination organizations focused on issues concerning America and the American public), and the lack of competing evidence submitted by Plaintiff, the Court concludes this digit weighs in favor of a finding of likelihood of confusion.

*(4) Identity of the Retail Outlets and Purchasers*

To the extent this digit bears relevance beyond the traditional retail context, the Court construes it to refer effectively to distribution outlets and target audiences in the particular context here of information dissemination. Defendants note that both parties distribute news-oriented website content

---

[6] Although summarized to omit various interruptions and the general laconic nature of Plaintiff's responses, Defendants' characterization of Plaintiff's deposition testimony is accurate.

via the internet. (Rec. Doc. 66-2 at 15). However, Defendants contend that because Plaintiff admitted in deposition to having no information or data concerning the actual visitors to and viewers of "www.thevoiceofamerica.com", this factor is indeterminate beyond the similarity in distribution platforms. (Rec. Doc. 66-2 at 15). The Court is not compelled to take so charitable a view. Framed at the highest level of generality, both parties target consumers of news media via the internet. As such, there is at least a nominal degree of similarity in consumers. Keeping in mind that no single factor is dispositive (and that this digit far from tips the balance), the Court concludes this digit weighs at least nominally in favor of a finding of likelihood of confusion.[7]

### (5) The Identity of the Advertising Media Used

Neither party addresses this digit in pleadings and, indeed, the record contains no evidence as to the various media used to promote either party's content, if any. Accordingly, this digit is indeterminate.

### (6) The Accused Infringer's Intent

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion." *Elvis Presley*

---

[7] A different conclusion might obtain if, for instance, Plaintiff distributed content via traditional print media while Defendants focused exclusively on digital media, or vice versa. However, here, there is at least some potential for confusion given the similarity of distribution channels.

*Enters., Inc. v. Capece*, 141 F.3d 188, 203 (5th Cir. 1998)(citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)). "Trademark infringement is a no-fault business tort. . . . The good faith junior user who negligently, ignorantly or innocently stumbles into confusing the public is still an infringer." McCarthy, *supra* at §23:107. Nevertheless, "[e]vidence of [an alleged infringer's] intent to confuse is *relevant* to the issue of likelihood of confusion and to the terms of an injunction and damages." McCarthy, *supra* at §23:108 (emphasis added).

With respect to this digit, Defendants cite deposition statements by Plaintiff reflecting his awareness of BBG's VOA broadcast during the same period he was working on his initial radio program. See Rec. Doc. 66-2 at 15-16 (citing Rec. Doc. 66-9 at 25-27). The referenced testimony, however, is inconclusive as reflected by the relevant passage:

> Q. And during your days working for the radio program, you never heard of the Voice of America in connection with the government radio program?
> A. That's not correct.
> Q. So you had heard about it?
> [Attorney objections omitted]
> Q. I'll just rephrase. I'll repeat the question.
> Q. I mean Voice of America broadcast of the Federal Government.
> A. When?
> Q. At the time – yeah. During your days working on your radio program, had you ever

21

> heard of the term Voice of America in
> connection with a broadcast of the Federal
> Government?
> A. I heard that there was. Never heard it,
> but I've heard of a government overseas –
> that the government broadcasted overseas on
> the, I guess – whatever you call it. Name
> Voice of America?

(Rec. Doc. 66-9 at 25-6). Plaintiff's testimony reflects familiarity with a government broadcast overseas which may or may not extend as far as knowledge of the specific name of that broadcast. Although it may be true that "[i]n the Internet context, in particular, courts have appropriately recognized that the intentional registration of a domain name knowing that the second-level domain is another company's valuable trademark weighs in favor of likelihood of confusion," there is questionable evidence here to suggest such knowledge on Plaintiff's behalf in registering his domain, due in part to equivocal positioning by Plaintiff. *Brookfield Commc'ns,* 174 F.3d 1036.

Defendants proceed, however, to refer to specific logos used on Plaintiff's website; in particular, a seal or crest-type logo depicting a stylized eagle emblazoned with stars and colored in red, white, and blue, as well as a banner composed of an American flag background with the words "THEVOICEOFAMERICA.COM" superimposed in white type and also

incorporating the aforementioned crest. (See Rec. Doc. 66-2 at 16). These items do reflect an undeniable "governmental" aesthetic. Although this, in itself, is not conclusive of an intent to confuse or deceive, it bears noting that no form of disclaimer appears on Plaintiff's website clarifying the absence of governmental affiliation or endorsement. Nevertheless, many sources recognize that use of a disclaimer is often ineffective to dispel likely confusion. *See, e.g.,* McCarthy at §23:51 (and sources cited therein). By contrast, some courts have viewed *inclusion* of a disclaimer as evidence of lack of intent to confuse. *See CCA and B, LLC v. F? W Media Inc.*, 819 F. Supp. 2d 1310, 1328 (N.D. Ga. 2011).

In light of the less than conclusive evidence of Plaintiff's knowledge at the relevant time as well as the generally dispensable nature of an alleged infringer's intent for purposes of trademark infringement under the Lanham Act, the Court concludes that this digit is indeterminate.

(7) *Any Evidence of Actual Confusion*

"The best evidence of likelihood of confusion is provided by evidence of actual confusion." *Exxon Corp. v. Texas Motor Exch. Of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980)(citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975)); McCarthy, *supra* at §13:13 ("Convincing evidence of significant

actual confusion occurring under actual marketplace conditions is the evidence of a likelihood of confusion. Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion.") "Parties often introduce survey evidence in an effort to demonstrate that there is a likelihood of confusion." *Exxon Corp.*, 628 F.2d at 506. "In borderline cases where evidence of confusion is not available or is not persuasive, the gap can sometimes be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." McCarthy, *supra* at §23:17. Nevertheless, "[m]ost surveys do not measure actual confusion." *Id.* at n.3. (citing Perlman, The Restatement of the Law of Unfair Competition: A Work in Progress," 80 Trademark Rep. 461, 472 (1990)). "[A] survey can produce 'evidence' (e.g. a likelihood of confusion), but it cannot and should not be seen as 'proof' (e.g. level of actual confusion)." McCarthy, *supra* at §23:17, n.3 (citing M. Rappeport, Design Issues for Controls, in Trademark and Deceptive Advertising Surveys, p. 217 (ABA Eds Diamond & Swann 2012)).

For purposes of the present motion, Defendants attach as an exhibit the expert report of a survey[8] conducted by Dr. Bruce Isaacson, the mechanics of which are summarized as follows:

---

[8] Attached at Rec. Doc. 66-15.

> [T]he survey and analysis presented in the Expert Report of Dr. Bruce Isaacson was based on 640 initial interviews, which resulted in a final set of 599 respondents for the survey. *See* DA258 (Isaacson Report, ¶45), SOF, ¶24.
>
> Survey respondents were segregated into four cells and shown either a test image of thevoiceofamerica.com or a control image used to remove background noise. *See* DA 252-255 (Isaacson Report, ¶¶25-31, 34), SOF, ¶25. No survey respondents mentioned Robert Namer in response to survey questions inquiring as to the source or affiliation for the test images. *See* SOF, ¶¶26-27.
>
> The net level of all measured confusion was 19.1%. *See* DA264-266 (Isaacson Report ¶¶ 65-71, Tables D-F), SOF, ¶28. Dr. Isaacson concluded that "that there is a significant likelihood of confusion between the website operated at www.thevoiceofamerica.com and the Voice of America." *See* DA266 (Isaacson Report ¶ 71), SOF, ¶29.

(Rec. Doc. 66-2 at 17-18).[9]

Defendants rely on Dr. Isaacon's determination of a "net level of confusion of 19.1%" to indicate that "effectively one of every five visitors to Namer's website would be confused as

---

[9] From a layperson's perspective, the survey effectively consisted of showing static images captured of Plaintiff's website to one group of consumers while showing a modified version of the web pages (which changed certain aspects to, *e.g.*, replace "Voice of America" with "Talk of America") to a control group. (See Summary and Results of Survey at Rec. Doc. 66-15). Participants were first asked to identify the perceived source of the content on the web pages. Next, participants were asked whether they believed the website shown to be affiliated with, sponsored or endorsed by any other entities. In the event of an affirmative answer, participants were asked to specifically identify whom they believed to be the source of the site content or whom they believed to be associated with the site (they did not select from a list of options, instead they manually entered a response). Dr. Isaacson then appears to have parsed the various responses, counting those identifying some iteration of "the government" or "Voice of America" as the affiliated entity.

to the source or affiliation with Defendants." (Rec. Doc. 66-2 at 18). Additionally, Defendants cite a string of cases in which courts found a likelihood of confusion relying on similarly derived "confusion levels" in ranges as low as approximately 10%. (Rec. Doc. 66-2 at 18)(citing for the quoted propositions, *Humble Oil v. American Oil Co.*, 405 F.2d 803, 817 (8th Cir. 1969) ("The percentage figure varies from 11% to as high as 49%. The lower figure itself is not an insignificant percentage."); *Starbucks Corp. v. Samantha Lundberg*, Civ. No. 02-948, 2005 WL 3183858 at *9 (D. Or. November 29, 2005) ("The percentage of consumers likely to be confused can be in the range of 10 to 15 percent or even lower."); *Miles Labs. Inc. v. Naturally Vitamin Supplements. Inc.*, 1 U.S.P.Q.2d 1445, 1457 (T.T.A.B. 1987) ("surveys disclosing likelihood of confusion ranging from 11% to 25% have been found significant."); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) ("We cannot agree that 15% is 'small.'"); *Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201, 203 (S.D. Cal. 1975) (11.4%): *James Burrough Ltd. v. Lesher*, 309 F. Supp. 1154, 1160 n.6 (S.D. lnd. 1969) (11%); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (survey evidence showing 10% likelihood of confusion sufficient)). (Rec. Doc. 66-2 at 12). With a level of confusion of 19.1%, the instant case is well within the

appropriate range for determining Plaintiff's use presents a "likelihood of confusion" to the relevant consumer base.

Plaintiff presents no contrary evidence to the results of Dr. Isaacson's survey. Instead, Plaintiff responds by challenging the relevance of Dr. Isaacson's methodology and resulting data. According to Plaintiff, under the familiar principles of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589, 125 L.Ed. 2d 469 (1993), Federal Rule of Evidence 702 requires district courts to perform a "gatekeeping" function to ensure that admitted scientific evidence is both relevant and reliable. (Rec. Doc. 75 at 7). While conceding Dr. Isaacson's educational and experience-based qualifications as an expert in this field, Plaintiff challenges that Dr. Isaacson's opinion was targeted toward the question at issue in this case. (Rec. Doc. 75 at 8). Plaintiff contends, "[t]he appropriate inquiry, which is used in numerous appellate circuits in addition to the Fifth Circuit, is whether a reasonably prudent consumer in the marketplace would be likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case. For Dr. Isaacson's opinion to be of any use, it must address that question." (Rec. Doc. 75 at 8)(citing *Brookfield Commc'ns*, 174 F.3d at 1060). Plaintiff cites deposition testimony of Dr. Isaacson as conclusive of the

issue that the survey did not screen for "reasonably prudent consumers" and that it is therefore inapposite for the purposes relied upon. (See Rec. Doc. 75 at 8-12). Before turning to the merits of the parties' arguments on this issue, the Court looks to relevant precedent governing the reliability and relevance of survey evidence in trademark infringement cases under the Lanham Act.

In *Exxon Corp v. Texas Motor Exch. Of Houston, Inc.*, 628 F.2d 500, 506 (5th Cir. 1980), the Fifth Circuit considered the standard for evaluating the type of "likelihood of confusion" survey evidence presented here. The court stated:

> Prior to examining the findings of the survey, it is important to determine exactly what weight is to be given to the evidence. There are two important factors which affect the weight to be granted to these surveys: the format of the questions and the manner of conducting the survey. *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (5th Cir. 1973).
>
> . . .
>
> The first factor to be considered in evaluating the validity of a survey is the format of the questioning. Surveys that involve nothing more than showing an individual a trademark and asking if it brings anything else to mind are given little weight in this Circuit. *Id.*; *Amstar Corp. v. Domino's Pizza, Inc. Id.* at 448. These surveys are seen as little more than word-association tests.
>
> . . .

28

> The second factor to evaluate[] in assessing
> the validity of a survey is the adequacy of
> the universe.  'The appropriate universe
> should include a fair sampling of those
> purchasers most likely to partake of the
> alleged infringer[']s goods or services.'
> *Amstar Corp. v. Domino's Pizza*, 615 F.2d at
> 264.

628 F.2d 506-7; *see also*, *Amstar Corp. v. Domino's Pizza, Inc.*,

615 F.2d at 264 (5th Cir. 1980).

With the foregoing in mind, the Court turns to a closer

inspection of Plaintiff's position and Dr. Isaacson's testimony

on the issue of the disputed survey's relevance. Plaintiff's

primary challenge, as reflected by the following excerpt,

appears to be to the sufficiency of the universe screened for

participation in the survey, so the Court takes this issue

first:

> Unfortunately for Defendants, Dr. Isaacson testified
> during his deposition that his analysis was *not*
> intended to test whether the reasonably prudent
> consumer would be likely to be confused. Consider the
> following exchange, during which Dr. Isaacson was
> being asked about the survey that he used in preparing
> his report:
>
> > Was one of the purposes of these questions
> > to identify whether or not a given
> > participant was a reasonably prudent
> > consumer?
> >
> > [Attorney objection omitted].
> >
> > THE WITNESS: I don't know what you mean by
> > reasonably prudent. And I guess I also don't
> > know what you mean by consumer.

29

The following passage is likewise instructive:

> When you first got this assignment and you began to work on this project for BBG, did you, say, take out a legal source -- McCarthy, for example -- and consult the legal criteria that this report would be trying to satisfy?
>
> A. I don't recall whether I've done so in this case, but I know that I've consulted McCarthy on Trademarks, to take that particular source, many, many times, hundreds of times for likelihood of confusion cases. I don't recall whether I specifically consulted it in this matter. But what I did in this matter certainly would have been informed in part by my consultation of that source over the years that I've been doing this kind of work.
>
> Q Okay. So these consultations -- and I'm not limiting this just to McCarthy, but you refer to past precedent. In your experience with reviewing the past precedent, do you have an understanding of what a reasonably prudent consumer would be?
>
> [Attorney objection omitted]
>
> A Do I have an understanding of what a reasonably prudent consumer would be?
>
> Q Yes.
>
> A I recall seeing the phrase, but you're asking me about three very specific terms and a very specific phrase, and I'd want to recheck the source materials if I was going to define that phrase for you.
>
> Q Sure.

A I do have an understanding of how to qualify people for likelihood of confusion surveys.

Q But am I correct in understanding your testimony, that when you say you have an understanding of how to qualify people for likelihood of confusion surveys, that your understanding does not encompass qualifying them based on whether or not they are reasonably prudent consumers?

A I'm saying that in this case, I did not qualify anybody as a consumer of anything. I qualified people as visiting a Website and visiting specific kinds of Websites, but I did not qualify people on purchase. I did not qualify people on prospective purchase. And so the phrase "consumer" does not apply to the kinds of respondents that were in my survey; thus *the phrase "reasonably prudent consumer" cannot apply because consumer doesn't apply.*

Q So then you're not talking about the likelihood that a reasonably prudent consumer would be confused between the Website thevoiceofamerica.com and the governmental entity Voice of America owned by BBG.

[Attorney objection omitted].

THE WITNESS: I think you and I have talked about the word "consumer" throughout the morning or afternoon, but I haven't qualified consumers as participants in my survey because the kinds of people who would come to thevoiceofamerica.com are not necessarily consumers.

They're visitors to a Website. They may leave that Website. They may never buy anything on that Website or on any sponsor to that Website. So we're not dealing with a context where we're talking about goods that

are sitting on a supermarket shelf. We're dealing with a context where we're talking about consumers of a particular -- we're talking about visitors to a particular Website, not consumers of a particular brand of shampoo, for example.

Q Okay. So then as just a yes-or-no question -- I do understand that we've been discussing this, but I'm trying to make sure that I'm clear and that we're on the same page in understanding the terms. Your survey is not designed to test the likelihood that a reasonably prudent consumer would be confused between the Website thevoiceofamerica.com and the governmental entity Voice of America, is it?

[Attorney objection omitted].

THE WITNESS: If you're only looking for a yes-or-no answer to that question, I can't give you a yes-or-no answer.

Q So you can't testify that you created a survey designed to test the likelihood of confusion on the part of a reasonably prudent consumer.

[Attorney objection omitted].

THE WITNESS: I'm happy to give the same answer I gave you a few minutes ago. But my survey did not interview consumers, nor would consumers be the relevant audience for a survey in this matter, nor are consumers the subject of this matter.

(Rec. Doc. 75 at 8-10). From this exchange, Plaintiff concludes

"[a]gain and again, Dr. Isaacson was asked if his report was

aimed at determining whether a reasonably prudent consumer would

be confused, and he not only rejected the idea that he should be

32

testing for reasonability, he rejected the applicability of consumers themselves to the case at bar." (Rec. Doc. 75 at 11). The Court considers this latter proposition specious. Dr. Isaacson clearly resisted the notion of "consumer" as that term is understood in a traditional retail context (i.e., a purchaser of goods), but confirmed that he screened for potential visitors to Plaintiff's website. Dr. Isaacons's further testimony revealed as much and more:

> THE WITNESS: Yeah, I don't want to comment on exactly what's meant by the phrase "reasonably prudent." And as I've mentioned before, I view these people, particularly in this survey, as respondents who are not necessarily consumers because we haven't qualified on purchase -- I haven't qualified people as actually buying anything or even potentially buying anything.
>
> But there are two comments that I would make based on that phrase. One comment is that when I qualify people for surveys, generally I qualify people who are – who include people from -- with a variety of knowledge about a particular subject.
>
> Some people are more knowledgeable, and some people are less knowledgeable, so that every respondent in the survey is someone who's been qualified to participate but may or may -- may be more knowledge or may be less knowledgeable; the same way that if you went to a supermarket or a department store, you would see some consumers who are very knowledgeable about the products that they might be shopping for and others who are less knowledgeable.

The second issue that becomes relevant in qualifying respondents for a survey like this is we need -- I need to qualify to make sure that I have, as I've mentioned before, a base of respondents who are relevant to the particular matter and, in particular, relevant to the party in the matter whose customers or potential customers or Website visitors I'm wishing to survey.

. . .

In this context I was looking to survey consumers or respondents who were relevant to thevoiceofamerica.com, and I was looking to survey people who were engaged in the kinds of activities that would be likely to make them visitors to the Website located at thevoiceofamerica.com.

And those are the questions that I asked. And the ways in which -- if I understand your question correctly, the ways in which they become relevant reasonably prudent is that some of these people are going to be experts or more knowledgeable on the subjects relating to the survey and some of them going to be less knowledgeable on subjects relating to the survey.

(Rec. Doc. 78-3 at 27-8, 30). Plaintiff's rigid adherence to the term "reasonably prudent consumer" is an exercise in pedantry that does nothing to discredit Dr. Isaacson's method of selecting the universe for the survey.[10] Further, Dr. Isaacson's

---

[10] There is a further misunderstanding as to the relevant universe reflected in the colloquy between Plaintiff's counsel and Dr. Isaacson concerning whether the relevant users are potential visitors to Plaintiff's site or the potential audience for Defendants' offerings. This claim is not raised by Plaintiff but is addressed by Defendants. It does not merit detailed discussion here, save to note that the proper audience is the one selected (i.e., for Plaintiff's website). *See* (Rec. Doc. 78 at 10-11); McCarthy, *supra* at §23:10 ("The traditional pattern of classic 'forward confusion' occurs when customers mistakenly think that the junior user's goods or services are

resistance to defining the term "reasonably prudent consumer" in the context of his deposition is justified both in that term's status as a legal term of art (beyond the area of his expertise) as well as the considerably unsettled nature of its meaning among the federal circuits themselves. The leading treatise on this area of law states:

> The courts have come up with many various definitions of how the reasonably prudent buyer makes his or her selections in the marketplace. Some of these definitions are wildly at variance with each other. While some courts say the average buyer is "reasonably discerning," other courts say the buyer is "hasty, heedless and easily deceived."

McCarthy, *supra* at §23:92. The term has been recognized to bear significant similarities to the concept of the "reasonable person," ubiquitous in American tort law, and is highly context specific. *See* McCarthy, *supra* at §23:95 (citing, *inter alia*, Restatement Third, Unfair Competition, §20). As such, it defies precise definition. What matters in the context of a trademark infringement action is that the universe "include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Exxon Corp*, 628 F.2d at 500.

---

from the same source as or are connected with the senior user's goods or services. ")

Dr. Isaacson's testimony above clearly reflects that the screening procedures employed for selecting the universe of survey participants was aimed at selecting those visitors who would be likely to visit the website located at "www.thevoiceofamerica.com." Additionally, a cross-section of visitors reflecting a spectrum of knowledge or familiarity with the subject matter at issue was selected. As such, the Court is unable to conclude that the universe was improperly selected for purposes of Dr. Isaacson's survey.[11]

The final issue remaining as to the survey evidence, therefore, is the validity of the format of the questioning. *Exxon*, 628 F. 2d 506-7. Neither party addresses this issue in any particular detail, besides Defendants' summary of the methodology underlying the survey set forth above. Relevant excerpts from Dr. Isaacson's expert report are set forth below:

> My confusion survey used an Eveready format, a well-accepted format in which respondents are exposed to a junior mark to see whether it is confused with a well-known senior mark. The survey tested two images showing the website at thevoiceofamerica.com. One image was dated December 22, 2011, and showed news and commentary from that date;

---

[11] The survey information reflects the following demographic and behavioral information concerning participants: (Gender) 49.1% Male, 50.9% Female; (Age) 18-34 years 32.1%; 35-54 years 35.6%; 55 years and over 32.4%; (Media Consumption in Past Month) Visited a website 100%, Watched television 96.3%; Read a magazine 84.9%, Listened to the radio 92.6%; (Visited a Website for Specific Purposes in Past Month) To read news or news commentary 100%; To shop for products or services 91.3%; To conduct banking or pay bills 86%; To play games or solve puzzles 62.2%, etc. (Rec. Doc. 66-15 at 286-289).

the second image was dated March 12, 2014, and showed more recent news and commentary.

During the survey, respondents were shown one of the two test images, or one of two control images. The control images were identical to the test images, except that they were altered to replace any mention of "Voice of America" with "Talk of America." For example, "thevoiceofamerica.com" was replaced with "the talkofamerica.com," and "Voice of America" was replaced with "Talk of America." The two control images had the same dates as the test images, and showed the same news and commentary as the matching test image.

. . .

The survey provides three measures for confusion:

i.   <u>Confusion as to Source</u>: The survey asked respondents what company, organization, or person operates the website they were shown.

ii.  <u>Confusion as to Affiliation or Connection</u>: The survey asked respondents whether they think that whoever operates the website in the picture is affiliated or connected with another company, organization, or person. Those answering yes were asked what other company, organization, or person is affiliated or connected with whoever operates the website.

iii. <u>All Measured Confusion</u>: All measured confusion sums confusion as to source plus unduplicated confusion as to affiliation or connection. This calculation excludes double counting by counting each respondent only once, even if they mentioned a company, organization, or person in response to more than one question. [Via Footnote: "For example, a respondent who provided a response in one question indicating they were confused as to source, and answered

> later a question indicating that they were
> confused as to affiliation or connection,
> would be counted only once for all measured
> confusion."]

(Rec. Doc. 66-15 at 2-3). In light of the foregoing, the survey
questions were clearly targeted at the relevant issue for
purposes of this matter; namely, whether visitors to Plaintiff's
site would be confused as to the possibility of Defendants as
the source of or affiliated with the content posted there. The
format of the questions was not simple "word association" as
rejected, for example in *Holiday Inns, Inc. v. Holiday Out in
America*, 481 F.2d 445 (5th Cir. 1973). In that case, the Fifth
Circuit affirmed a district court's conclusion that showing
participants a placard bearing the words "Holiday Out" and then
simply questioning as to their "state of mind" degenerated into
"a mere word-association test entitled to little weight because
the format failed to account for the number of responses
attributable to use of the word 'Holiday' as distinguished from
the service mark Holiday Out." *Id.* at 447-48. Here, by contrast,
the survey was carefully designed to gather participants'
conclusions both as to the specific source of the content
reflected in the images shown as well as the identity of any
affiliates or sponsors of such content. As such, the survey went
beyond mere word association and instead focused participants on

38

the specific and relevant issue of their impression as to the sources of and behind the content shown. Accordingly, the Court concludes the format of the questions was valid and relevant. In light of Dr. Isaacson's finding of an adjusted 19.1% net confusion rate, Defendants have successfully shown at least some degree of actual confusion with respect to Plaintiff's use of the disputed mark. As noted above, although this is not *required* for a finding of "likelihood" of confusion (the relevant Lanham Act inquiry), it is certainly relevant and persuasive. "The existence of some evidence of instances of actual confusion does not necessarily prevent the grant of a summary judgment of dismissal for lack of a triable issue of a likelihood of confusion. A court may find evidence of actual confusion insufficient to present a triable issue of fact where evidence in rebuttal provides a reasonable explanation discounting isolated instances of confusion." McCarthy, *supra* §23:13. In this case, Plaintiff has come forward with no affirmative evidence of his own to dispute the evidence presented by Defendants and the deadlines for doing so have long passed. Accordingly, the Court concludes the "actual confusion" digit weighs in favor of Defendants.

*(8)  Degree of Care Exercised by Potential Purchasers*

Plaintiff asserts no arguments as to this digit and Defendants contend it is indeterminate in light of the fact that Plaintiff admits to having no information or data of any kind as to the actual viewers of his website. The Court therefore finds this digit indeterminate.

In light of the foregoing, specifically that the digits of (1) type of mark, (2) similarity of marks, (3) similarity of products or services, (4) identity of retail outlets and purchasers (consumers), and (7) evidence of actual confusion weigh in favor of Defendants, the Court determines that Plaintiff's use of the mark "Voice of America" in his published content and domain name produces a "likelihood of confusion" for purposes of Trademark Infringement under the Lanham Act, 15 U.S.C. §§1051, et seq. The Court also notes particularly that the high degree of similarity between the marks and the relative overlap in potential audience, make the result here especially clear. *See, e.g.,* McCarthy, supra, §23:20 ("Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement.") Given that the opportunity for Plaintiff to seek to introduce contradictory

evidence is foreclosed at this juncture, the Court concludes there remains no genuine issue of material fact as to this issue and therefore that Defendants are entitled to summary judgment on the issue of trademark infringement.[12] Accordingly,

**IT IS ORDERED THAT** Defendants' motion for summary judgment is **GRANTED** on the issue of Plaintiff's trademark infringement.

### (2) Plaintiff's Laches Defense

Having found for Defendants on the issue of trademark infringement the Court turns, briefly, to Plaintiff's asserted defenses. A prima facie defense of laches requires the alleged infringer to show (1) delay in the senior user's asserting its trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. As an affirmative defense, Plaintiff bears the burden of establishing each of these elements by a preponderance of the evidence. In the context of a summary judgment motion, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary

---

[12] Where there is substantial similarity between the competing marks and an absence of evidence to support a genuine fact dispute, trademark infringement actions are properly resolved on summary judgment. *See*, *Beef/Eater Restaurants, Inc. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968)(affirming grant of summary judgment by district court in favor of finding of likelihood of confusion where marks were very similar, notwithstanding the fact that parties were not in direct competition and goods and services were not identical.)

judgment proof that there is an issue of material fact warranting trial. . . . Only when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party' is a full trial on the merits warranted." *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616 (5th Cir. 1994)(citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2558, 91 L.Ed.2d 265 (1986); *Moody v. Jefferson Parish Sch. Bd.*, 2 F.3d 604, 606 (5th Cir. 1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 197. 190 (5th Cir. 1991); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

With respect to the first element, the parties dispute whether the relevant period for delay begins in 2000, when Plaintiff received Defendants' first letter pertaining to his radio activities; some intermediate period (potentially beginning in 2004 when content was first posted to Plaintiff's site); or 2011, the date of BBG's letter specifically addressing web activities. (See Rec. Docs. 75 at 6; 78 at 5). Because the Court resolves this issue on other grounds, a detailed discussion of these various positions is unwarranted. Notwithstanding any arguments concerning the doctrine of progressive encroachment,[13] there is no dispute as to the fact

---

[13] Which "may provide an excuse for an otherwise reasonable delay" when a junior user expands the use of the contested mark so as to bring it more

that Plaintiff received Defendants' letter of 2000. (See Declaration of Plaintiff, Rec Doc. 75-7 at ¶ 9)("On February 7, 2000, the BBG sent me a letter asserting that they had the legal right to use the name, "Voice of America", and demanded that I cease using the name."). This letter specifically directed Plaintiff to cease "using this name and initials in connection with [his] programming." (Rec. Doc. 1-5). "The Fifth Circuit has long recognized that actions taken after the receipt of a cease and desist letter have an important impact on a court of equity's decision in a trademark infringement case." *Abraham v. Alpha Chi Omega*, 796 F. Supp. 2d 837, 853 (N.D. Tex 2011)(citing *Conan Props. v. Conans Pizza, Inc.*, 752 F.2d 145, 152-53 (5th Cir. 1985). "Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the [claimant's] objection to such acts." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998)(cited in *Abraham*, *supra* at 854). Under the present facts, even affording Plaintiff the benefit of the doubt in terms of gauging the delay period from the earliest of the various dates (2000), there is no question that Plaintiff was on notice of Defendants' objections to his use of the service mark in connection with his

---

squarely into competition with the senior user. *See Abraham v. Alpha Chi Omega*, 796 F. Supp. 2d 837, 853 (N.D. Tex 2011).

programming. As such, he continued to use the contested mark at his own risk.

Despite any issues relating to the excuse of any delay, to the extent any such might exist, Plaintiff's defense fails on the third-prong entirely. Plaintiff has provided no evidence to suggest undue prejudice in the event Defendants are allowed to assert the validity of their mark against him and to obtain injunctive relief. (Rec. Doc. 78 at 7). Plaintiff has provided no information as to any business or economic activity or benefit associated with his challenged activities and the deadlines for doing so have passed. In fact, Plaintiff has shown himself to be intransigent with respect to particular matters of discovery and has done so to his own detriment. Additionally, Plaintiff may not rely on mere prejudicial or detrimental reliance in light of the undisputed cease-and-desist letter he received.

In light of the foregoing, the Court concludes that Plaintiff has failed to carry his burden for purposes of opposing summary judgment on the issue of the defense of laches. Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment on this issue is **GRANTED** and this claim is **DISMISSED**.

*(3)* *Plaintiff's Defense of Invalidity for Genericness*

Federal trademark law distinguishes between a variety of classes of terms for purposes of protection under the Lanham Act. Relevant for present purposes, as a general proposition, a "generic term is not capable of distinguishing the source of one product from another, [and] cannot be registered as a trademark or service mark . . . ." McCarthy, *supra* at §12:1. "[A] registered mark may be canceled at any time on the grounds that it has become generic." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (5th Cir. 1985). "If [claimant] has a federal registration, it constitutes a strong presumption that the term is not generic and defendant bears the burden of overcoming the presumption." McCarthy, *supra* at §12:12."

As to this issue, Defendants assert that Plaintiff has submitted no evidence in support of his defense. (Rec. Doc. 66-2 at 23). Additionally, Defendants cite the McCarthy treatise for the proposition that

> Consumer surveys have become almost de rigueur in litigation over genericness. Judges are now used to survey evidence and often expect to receive evidentiary assistance by surveys in resolving generic disputes. A litigant who alleges that a designation is not a valid trademark because it is perceived as a generic name of a product or service and does not introduce a survey to support this challenge may be viewed as less than serious by some judges.

45

McCarthy, *supra* at §12:14. However, it should be noted that "there is no need for a survey if other evidence overwhelmingly proves that the disputed designation is a generic name." *Id.*

As noted above, because Defendants hold a validly registered mark, Plaintiff bears the burden of proof on the defense of invalidity for genericness. In the context of a summary judgment motion, when the nonmoving party bears the burden of proof at trial, it must "go beyond the pleadings" and by affidavits, or record evidence, designate "specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.ed.2d 265 (1986).

Plaintiff has provided no evidence aside from conclusory statements in his initial answer to Defendants' counterclaim as to the genericness of the mark "Voice of America."[14] He has additionally failed even to respond to Defendants' arguments in this respect in his opposition to the instant motion. (See Rec. Doc. 75). The Court notes that Plaintiff has shown a consistent lack of diligence in the instant proceedings or, at the very least, a detrimentally blasé attitude as to the seriousness of

---

[14] It should be noted that even these contentions may be incorrect to the extent they rely on a conclusion that the combination of two generic components yields a generic composite. *See* McCarthy, *supra* at §12:57 ("The Federal Circuit has said that a genericness analysis must be applied to a challenged phrase as a whole, 'for the whole may be greater than the sum of its parts.'")

the instant motion for purposes of the continued viability of his cause of action.[15] Because Plaintiff has failed to come forward with any evidence sufficient to demonstrate a possibility of success in establishing the elements of the defense of genericness at trial, Defendants are entitled to summary judgment on this issue. Accordingly,

**IT IS ORDERED THAT** Plaintiff's defense of genericness is **dismissed**.

*(4) Injunctive Relief*

Finally, the Court turns to Defendants' requested relief of a permanent injunction proscribing Plaintiff's continued use of Defendants' mark in connection with any of his activities. (See Rec. Doc. 66-3). As noted above, injunctive relief properly issues when the movant shows (1) they have suffered irreparable injury, (2) there is no adequate remedy at law, (3) that, considering the balance of hardships between the parties, a remedy at law is warranted, and (4) that it is in the public's interest to issue the injunction. (Rec. Doc. 66-2 at 12)(citing *Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir. 2006); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[15] The record reflects that Plaintiff was previously the subject of a motion for sanctions, which ultimately resulted in Magistrate Judge North issuing an order requiring the supplementation or correction of various discovery responses in light of Plaintiff's failure to satisfactorily comply with discovery obligations. (See Rec. Doc. 63). See also Rec. Doc. 66-4 at 11 detailing Plaintiff's failure to serve or execute a large number of potential discovery requests.

Plaintiff's sole challenge to Defendants' entitlement to injunctive relief in this case consists of an argument that Defendants have failed to show irreparable harm. In support of this contention, Plaintiff argues Defendants have allegedly failed to take similar action against the "even more similar" domain name "www.voiceofamerica.com," which public records reveal to be owned by a private entity. (Rec. Doc. 75 at 12). Defendants respond by noting that, at the time of writing of their pleadings (and, as the Court will take judicial notice of, the writing of this opinion), that domain name does not appear to resolve a functioning website. (See Rec. Doc. 78 at 13). This argument is irrelevant to the issue presented.

"An injunction is the usual and standard remedy once trademark infringement has been found. Consider the alternative. If a court were to award some monetary compensation and permit the infringer to continue, the result would be a kind of judicially imposed compulsory license. Such a mandated license would permit likely confusion to continue and deprive the consuming public of a truthful marketplace." McCarthy, *supra* at §30:1 (citing *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008). As discussed above, this Court concludes Defendants have established their entitlement to summary judgment on the issue

48

of Plaintiff's infringement of their registered mark under the
Lanham Act. Additionally, Defendants complain of the harm that
will result from the continued likelihood of confusion (inherent
in the Court's determination of infringement), which will hinder
Defendants' statutory requirement "to serve as a consistently
reliable and authoritative source of news . . . that is
accurate, objective and comprehensive." (Rec. Doc. 66-2 at 25-
26)(citing 22 U.S.C. §6202(c)). Defendants also note the
potential harm to U.S. foreign policy with respect to any
hindrance of Defendants' mission to other countries. (Rec. Doc.
66-2 at 25). Not only are the specific instances of harm cited
by Defendants compelling, it is clear that there is no adequate
remedy at law, given the impracticability of requiring parties
to continually bring actions for and to prove damages, were the
Court to permit Plaintiff's continued infringement.
Additionally, the public interest is best served by preventing
confusion in the marketplace. *See*, *Brookfield Commc'ns*, 174
F.3d at 1066. The Court also notes that Defendants have no
objection (to be sure, they could not reasonably contend to the
contrary) to Plaintiff's continued operations on his domain name
"www.hottalkradio.com," so long as the content of that page is

amended to omit use of Defendants' mark and to operate consistently with any orders to issue from this Court.[16]

In light of the foregoing, the Court concludes Defendants have shown entitlement to injunctive relief pursuant to 15 U.S.C. §1116.[17] **IT IS ORDERED** that summary judgment is **entered in their favor**.

### Conclusion

In summary, the Court finding for Defendants on all issues presented by the instant motion, **IT IS ORDERED THAT:**

(1)   Summary judgment is entered on Defendants' counter-claim of trademark infringement against Plaintiff, pursuant to 15 U.S.C. §1114;

(2)   Plaintiff's defense of laches is dismissed;

(3)   Plaintiff's defense of genericness is dismissed; and,

---

[16] The Court notes Plaintiff's bewilderingly inapposite argument in opposition to Defendants' motion for summary judgment that: "While there are debatable questions regarding whether a reasonably prudent consumer would be confused between the word mark Voice of America and the website URL thevoiceofamerica.com, there is absolutely *no* basis to conclude that such a consumer would be likely to confuse the URL hottalkradio.com with the word mark Voice of America. As such, that website is not properly at issue herein, and Defendants are not entitled to a summary judgment of infringement as to that site." (Rec. Doc. 75 at11). Quite -- however, this statement completely overlooks the fact that at issue presently is Plaintiff's infringement by virtue of the use of the *phrase* "Voice of America" in connection with his activities. To the extent the website accessible via the domain name hottalkradio.com includes content impermissibly identifying itself under this moniker, it is unquestionably at issue in the present matter.

[17] The statute provides: "The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . ." 15 U.S.C. §1116(a).

(4) Defendants are entitled to injunctive relief, pursuant
    to 15 U.S.C. §1116.

New Orleans, Louisiana, this 5th day of November, 2014.


_____
UNITED STATES DISTRICT JUDGE